SAUER *v.* McCLINTIC-MARSHALL CONSTRUCTION CO.

1. PARTNERSHIPS—NAMES—FICTITIOUS NAME.

Under Act No. 101, Pub. Acts 1907 (1 How. Stat. [2d Ed.] § 2626), requiring persons doing business under assumed names to file a certificate in the county clerk's office showing who are the members and their true names, a firm name which contains the surnames of the persons composing it is not within the provisions of the statute.

2. SAME—PARTIES.

Where a copartnership consisted of three brothers, in business as Chas. A. Sauer & Company, and the senior member of the firm was Charles A. Sauer, and it appeared that before entering into the contract sued upon one of the brothers retired from the firm, which had previously filed a certificate as required by said act, the partnership was entitled to bring an action, although a new certificate was not filed until some months after executing the agreement.

3. PLEADING—CONTRACTS—PRECEDENT CONDITIONS.

When the consideration of a contract is executory, or performance depends on some act to be done or foreborne by the plaintiff or on some other contingency, the plaintiff must allege the fulfillment of such condition precedent, whether the same is affirmative or negative or to be performed or observed by him or by defendant, or plaintiff must excuse his default or nonperformance.

4. SAME—CONDITIONS PRECEDENT—WAIVER OF OBJECTION.

A declaration based on a contract to manufacture and deliver structural steel, the buyer to provide the manufacturer with complete information for doing the work, was fatally defective as a pleading for failure to allege performance of the conditions precedent: and defendant did not waive the defect by pleading the general issue.

5. CONTRACTS—SALES.

Where defendant agreed to furnish material to a contractor "within eight or ten weeks after receipt of complete information for detail drawings" but no date was specified prior to which it was necessary to furnish in-

formation for such drawings, and plaintiff furnished the required data within thirty days from the time of entering into the contract, so that sufficient time remained in which to carry out the agreement, plaintiff could not be held to be in default, having complied with the conditions within a reasonable time.

6. DAMAGES—MITIGATION—DIMINISHING LOSS.
    In case of a breach of contract the injured party must make every reasonable effort to diminish the damages suffered.

7. SAME.
    Where plaintiff, in an action for breach of contract, had supplied itself with material at an increased price after defendant's default in delivery, and it was not shown that defendant made general inquiry as to market prices, but paid more than the current market price, the verdict for an amount in excess of the difference between contract and market price was contrary to the weight of evidence and should be reversed on error.

Error to Washtenaw; Kinne, J. Submitted January 9, 1914. (Docket No. 6.) Decided March 27, 1914. Rehearing denied June 4, 1914.

Assumpsit by Charles A. Sauer and others against the McClintic-Marshall Construction Company for breach of a contract of sale. Judgment for plaintiffs, and defendant brings error. Reversed.

*Cavanaugh & Burke,* for appellant.

*Robert E. Bunker,* for appellees.

STEERE, J. Plaintiffs recovered a judgment of $1,026.34 against defendant in the circuit court of Washtenaw county for breach of a contract by the terms of which defendant agreed to furnish plaintiffs a quantity of structural steel for use in constructing a building at the University of Michigan, in Ann Arbor, at the price of $1,450. Plaintiffs were a firm of contractors and builders doing business under the

firm name of Chas. A. Sauer & Co., having offices in the cities of Detroit and Ann Arbor. Defendant was a large company engaged in the fabrication of structural steel at Pittsburg, Pa., having an office at Detroit in charge of a designing engineer. In preparation for bidding on a contract for the construction of a storehouse and shop building for the University of Michigan, upon which the regents of that institution were about to receive bids, plaintiffs obtained estimates from various sources for material which would be necessary in the construction of said building, the cost of which it was essential to ascertain before bidding. Defendant's representative at Detroit entered into communication with plaintiffs upon that subject, with a view to furnishing them whatever structural steel would be required for the building under consideration in case they were the successful bidders. These negotiations resulted in a proposal in writing, dated July 6, 1912, to furnish the structural steel according to certain drawings referred to, for $1,450, further providing:

"Shipment to be made in ten weeks.   *   *   *

"Two hundred dollars will be added to the above price if shipment is made in five weeks.

"Terms of payment and details of contract to be as we may mutually agree.

"We trust you will find this price attractive and that it will be of assistance to you in landing this order."

In their competitive bid for the erection of said building plaintiffs made use of and relied upon said proposal. They were the successful bidders and obtained the contract, which by its terms required that the building should be completed on November 1, 1912. In pursuance of their previous negotiations the contract in question in this case was made by letter of proposal from defendant dated July 22, 1912, accepted by one from plaintiffs the following day. The

proposal was to furnish at a stated price the structural steel for said building "in accordance with drawing No. 7412—1, prepared by the Trussed Concrete Steel Company and approved by Mr. James H. Marks, architect." Amongst other things it stated, "All materials to be delivered f. o. b. cars, Ann Arbor, within eight to ten weeks after receipt of complete information for detail drawings," which were to be made by defendant subject to the approval of the engineer, or architect, who was Mr. Marks. The acceptance concluded as follows:

"We are to furnish you with the pattern for holes to be punched in the lintels for our bolts. Kindly prepare your shop drawings at once and submit your copy for the O. K. of Mr. Marks, and also one copy for his files. Please arrange to make your delivery within the specified time and prevent any delay."

The shop drawings mentioned in the acceptance were the detail drawings named in the proposal, which are made by the fabricator of structural steel from the general plans of the architect and such other and more complete information as is necessary in preparing accurate drawings for steel construction, relative to patterns of holes to be bored, etc. Under the contract this "complete information" was to be furnished by plaintiffs. Correspondence was had upon this subject, with requests for information and answers claimed not sufficient or complete, giving rise to some controversy as to when and how the complete information was obtained. It is clear, however, that it had been furnished defendant as early as August 6th. Mr. Walker, defendant's agent at Detroit, testifies:

"On August 6th I got the information from Mr. Sauer and Mr. Flook * * * which was sent to Pittsburg, where our detail drawings were made up. * * * I came out to Ann Arbor on August 6th and went to Mr. Sauer's office and from there to the architect's office. From the architect's office I got complete

information and took it with me. We did not think we had complete information and we got that on August 6th."

On August 15, 1912, defendant wrote plaintiffs, inclosing prints of the shop drawings, asking for their approval. These were approved by the architect and received back by defendant on or before August 19th. On August 26th defendant sent plaintiffs prints of certain sheets "for your files." On September 11, 1912, plaintiffs wrote defendant, calling attention to the fact that under their contract the building must be completed by November 1st, stating that they could not be held up waiting for steel, and if defendant could not fill its contract, entered into on July 23d for delivery in from 8 to 10 weeks, it was necessary for plaintiffs to be advised at once, saying further:

"If you find that you cannot furnish this material from your own mill or stock on hand then go out into the open market and procure it, but do not delay the shipment of this material under any condition.

"Should you fail to make arrangements for the shipment from your own mill or market, then we request that you instruct us to protect our interests in the way of going into the market and procuring some at the best price possible and charge your firm the difference in price, if any. This is very much against our wishes, but the situation demands some immediate action. You must appreciate the fact that since the signing of this contract July 23d seven weeks have elapsed with nothing being accomplished. Kindly advise us at once your wishes in the matter and greatly oblige."

Nine days later, on September 20th, defendant replied:

"At the request of our Detroit office we telephoned you today, stating that the best promise we have been able to secure for delivery of unpunched material required for storehouse and shop building for the University of Michigan, was delivery complete November 20th to 30th. On this account there is no prospect

that we can ship you all this material prior to December 15th.

"There are a variety of sections required for this work, and, although orders were placed promptly, the above is the result. We do not consider ourselves entirely at fault for this state of affairs on account of the delay in furnishing us with information absolutely necessary to get out the work.

"We will continue to do everything in our power to hasten this work, and if by any means we can anticipate the dates given above, we will do so, but we cannot find reason to hope that we can ship it much earlier."

On September 27th plaintiffs answered, stating they could not be delayed, that to permit the building to go ahead they were obliged to pay in excess of defendant's contract price $1,002 for the steel, and to that end were placing an order for the same with another company in a position to furnish it in three weeks, closing with a discussion of the subject unimportant here. The material specified in the contract was furnished by the Toledo Wire & Iron Works, and delivered f. o. b. at Ann Arbor within a month from the time of receiving the order, but the building was not completed on time according to contract. Plaintiffs' witness on that subject testified he thought the building was ready for occupancy in December, but did not know when it was accepted by the architect; that if defendant had furnished the steel October 28th, the last day for its delivery, he thought they could have had the roof on by November 10th. Defendant having refused to make good to plaintiffs the increased cost of the steel above its contract, this action was brought to recover the same.

The questions raised by defendant's various assignments of error are briefly summarized as follows: Plaintiffs cannot recover because they were carrying on business under an assumed or fictitious name, in violation of Act No. 101, Pub. Acts 1907 (2 How. Stat.

[2d Ed.] § 2626) ; the special count upon which they rely in their declaration is defective; they themselves rescinded the contract and breached the same by delaying to furnish complete information for detail drawings, which excused the defendant from furnishing the material within the 8 or 10 weeks specified, it being shown that market conditions had so changed that defendant could not get the material and perform within that length of time; the verdict was contrary to the weight of evidence and instructions of the court, and the court erred in refusing defendant's request to charge that, if the jury found the amount of steel called for in the contract could have been purchased in the open market, and at an advance of $8 per ton above the contract price, that would be the measure of damages.

The testimony disclosed that on July 6, 1912, when the first proposal was made, the firm of Chas. A. Sauer & Co. was composed of Charles A. Sauer, Adam J. Sauer, and John J. Sauer, three brothers, who had, on April 22, 1912, filed a certificate stating who composed said firm, under the provisions of Act No. 101, Pub. Acts 1907, and on July 16, 1912, John J. Sauer retired from the firm, his interest being purchased by the other members. On December 3, 1912, Chas. A. Sauer & Co. again filed a similar certificate, showing the then members of the firm to be Charles A. Sauer and Adam Sauer, the plaintiffs herein. It is urged upon these undisputed facts plaintiffs are barred from recovery, under *Cashin* v. *Pliter,* 168 Mich. 386 (134 N. W. 482, Ann. Cas. 1913C, 697). As pointed out in that case, the manifest object of said Act No. 101 is to protect the public against imposition and fraud, greater opportunity for which is afforded to parties who, choosing not to do business in their own names, conceal their identity and avoid legal responsibility by dealing with the public under a false and fictitious name which furnishes no clue to who the real and re-

sponsible parties are. Such was the name assumed by plaintiffs in the *Cashin Case,* no name of any one connected with the concern being even suggested, but a fanciful, pretended and fictitious name assumed. Construing this statute with the evil sought to be corrected in mind, the courts have inclined to the view that a firm name which gives the true names, or surnames, of its members is not assumed or fictitious, within the meaning of such a statute, even though the baptismal name of each member may not be stated. *Axe* v. *Tolbert, ante,* 556 (146 N. W. 418), and cases there cited. In the case before us the identity of C. A. Sauer, the head of the firm, is directly pointed out by the firm name; both members of the firm are named Sauer; a certificate then filed under the statute gave their names in full. It is true that it also gave the name of a brother who, when this contract was made, had retired from the firm, and who by reason of that certificate might possibly be yet held responsible, but the firm business as an entirety was continued as before, with no new members, with the same head, in the same name, and occupying the same offices. Under the circumstances shown we do not find that plaintiffs are barred from their right of action, under this objection.

Plaintiffs declared specially upon the contract, with the common counts added. The proofs would not support recovery under the common counts. Plaintiffs' claim was under the special count for breach by anticipation of the contract there stated and declared upon. It was an executory contract. The written contract as alleged and set out imposed upon plaintiff a condition precedent, the furnishing of "complete information" for shop drawings. The declaration is defective in failing to allege performance of this condition on plaintiff's part, which is an essential averment under such a contract, in order to show breach

179 MICH.—40.

on the part of defendant and state a cause of action. This is an elementary rule of pleading. In 1 Chitty on Pleadings (1879), p. 329, it is said:

"But when the consideration of the defendant's contract was executory, or his performance was to depend on some act to be done or foreborne by the plaintiff, or on some other event, the plaintiff must aver the fulfillment of such condition precedent, whether it were in the affirmative or negative, or to be performed or observed by him or by the defendant, or by any other person, or must show some excuse for the nonperformance."

"Where conditions precedent to the right of action exist, their performance must be alleged by plaintiff in order to state a cause of action, or where there has been no performance and plaintiff intends to rely upon matter excusing performance such matter must be alleged." 31 Cyc. p. 107.

"A special count that states no cause of action supports no proof." *Mitchell* v. *Scott*, 41 Mich. 108 (1 N. W. 968).

Omission of the requisite allegation referred to evidently arose from counsel's construction of the contract declared upon, with which the trial court correctly, we think, appeared to disagree. The question being raised by a motion of defendant for a directed verdict because the count did not state a cause of action, counsel for plaintiffs replied to the court's inquiry why it was not plaintiff's duty to aver that they furnished the complete information and defendants then failed to complete the contract: "Because we were not bound to do that. They were bound to get it." The court further said, "As a matter of pleading, I have considerable doubt whether or not that may not be a good and complete and fatal objection to this declaration," and after further discussion finally suggested that an amendment would be granted if desired, to which counsel replied, "We do not care to amend our declaration." The court decided "to

hold this matter in court and finish it upon its merits if the plaintiffs see fit to take their chances."

Defendant pleaded the general issue with special notice that plaintiffs had rescinded the contract and first breached the same, and it is urged that defendant waived all defects in the declaration by pleading the general issue and going to trial upon the merits. The authorities are abundant that by so pleading and going to trial on the merits a defendant waives all technical defects in the declaration, and the courts view with disfavor any attack on pleadings made by motion or objection to evidence during the trial; but a plea of the general issue does not waive the essential allegations of a cause of action, and a declaration which will not support a judgment, and does not state a cause of action, cannot be made good by not demurring. *Stoflet* v. *Marker,* 34 Mich. 313; *Rowland* v. *Superintendents of the Poor,* 49 Mich. 553 (14 N. W. 494) ; *Schindler* v. *Railway Co.,* 77 Mich. 136 (43 N. W. 911). When confronted by such conditions the courts are properly prone to freely exercise the authority conferred by our liberal statute of amendments, thus preserving the substantial rights of the parties without sacrificing all fundamental principles of pleading. This is well stated in *Barton* v. *Gray,* 48 Mich. 164 (12 N. W. 30), as follows:

"Objections which appear upon the face of the pleadings, and which are fatal in any stage of the case, should be taken at the earliest opportunity, and before unnecessary expense has been incurred; and if the party entitled to take them fails to observe this reasonable and just rule, all intendments should be against him, and if possible to save the case by amendment, the necessary permission should be given."

In the instant case the necessary permission was given, but declined, and no amendment made to the declaration which now stands as a basis of this judgment, destitute of any averment of an essential fact

which is a prerequisite to the right to recover. Under such conditions, where the question has been timely raised and properly preserved, the judgment cannot be sustained.

We are unable to accept defendant's contention that the contract should be construed as requiring plaintiffs to furnish complete information for shop drawings at the time of making the contract or promptly thereafter. The contract is in writing, and does not so specify. It was, of course, made with reference to the university building which was to be finished November 1st. Defendant agreed to deliver all material at Ann Arbor f. o. b. within 8 or 10 weeks after receipt of the information desired, and had offered to deliver within 5 weeks for $200 additional price. Correspondence on the subject not resulting in obtaining all the information desired, defendant's agent visited plaintiffs' office on August 6th, and from there went to the architect's office. As a result the defendant was then furnished with complete information, just how or by whom is unimportant. The condition precedent imposed upon plaintiffs was complied with in all essentials within a reasonable time. Assuming that after this it was their duty to see that defendant's shop drawings for its workmen were approved by the architect, this was done by August 19th, which yet gave defendant the maximum contract time before the building was to be completed. Defendant had already received drawings for the structural steel on July 6th, and the architect's plans on July 23d. We find nothing in the contract to suggest that it was made with reference to subsequent market conditions affecting defendant's ability to perform, and the testimony shows it was possible to perform it within a month after receiving the order.

Much space in plaintiffs' brief is devoted to the question of breach by anticipation in substantiation

of the rule, early declared in the English case of *Hochster* v. *De La Tour*, 2 E. & B. 678, that refusal or inability of one contracting party to perform on his part discharges the other from further responsibility and entitles him to an action for damages at once, a rule upon which the American courts are somewhat at variance; but this question was not raised by defendant on the trial, nor fairly presented by any assignment of error; the position of defendant's counsel being that the rule has no application here because the contract was first breached by plaintiffs.

A motion for a new trial was made and urged by defendant on the ground, amongst others, that the verdict was against the evidence and contrary to law. It is a well-established rule of law that in case of a breach of contract the injured party must make every reasonable effort within his power to diminish the damages suffered. 13 Cyc. p. 73; *Harrington-Wiard Co.* v. *Manufacturing Co.*, 166 Mich. 276 (131 N. W. 559). The contract price of the material to be furnished by defendant was $1,450. Plaintiffs bought the same material of the Toledo Iron & Wire Co. at an increased price of $1,002, without obtaining quotations from other competitors or making any inquiries elsewhere as to the condition of the market or possibility of securing a more favorable price. The contract required 34 tons of steel, and it was shown that such steel could have been bought in the open market during August, September, and October of that year at an advance of $8 per ton, and the usual price for quick delivery was about $4 per ton extra. As the testimony stands in this record, it appears by the weight of evidence, and in some particulars by the undisputed evidence, that plaintiffs made no such general inquiry and effort, and exercised no such diligence to secure the material at the fair market price and thus diminish the damages, as the law requires, and that, had they done so, a substantial reduction from

the price paid might and probably would have been obtained. In that particular we conclude that the verdict was against the weight of evidence and contrary to law.

For the errors stated, the judgment must be reversed, and a new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.