## RUTHERFORD v. ELLIOTT.

### In re VARNEY.

Circuit Court of Appeals, Sixth Circuit. January 3, 1928.

#### No. 4849.

1. Bankruptcy ⟷340(4)—Evidence held to sustain order disallowing claim, on ground consideration for bankrupt's indorsement was compounding of felony (Barnes' Code W. Va. 1923, c. 145, § 23, c. 147, § 19).

Evidence *held* to sustain order disallowing claim against bankrupt estate, on ground that consideration for bankrupt's indorsement of note on which claim was based was the compounding of a felony, under Barnes' Code W. Va. 1923, c. 145, § 23, c. 147, § 19.

2. Contracts ⟷128(1)—Parties' intention to compound crime rendered contract unenforceable on ground of public policy.

Intention of parties in executing and indorsing note to compound a crime rendered the contract unenforceable on ground of public policy.

3. Contracts ⟷137(1)—Contract, wherein part of consideration was tainted with illegality, is "illegal contract."

A contract is illegal, where an essential and indivisible part of the consideration is tainted with illegality.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Illegal Contract.]

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

In the matter of the bankruptcy of Pricy A. Varney and of Nancy Jane Varney, where-in W. K. Elliott was trustee. From an order of the District Court (22 F.[2d] 230), affirming an order of the referee disallowing the claim of A. G. Rutherford, claimant appeals. Affirmed.

See, also, 18 F.(2d) 956.

Wells Goodykoontz and Randolph Bias, both of Williamson, W. Va. (Ira J. Partlow, of Williamson, W. Va., on the brief), for appellant.

Stanley Reed, of Ashland, Ky. (Browning & Reed, of Ashland, Ky., and Stratton & Stephenson, of Pikeville, Ky., on the brief), for appellee.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This case is here on appeal from an order of the District Court affirming an order of the referee in bankruptcy made in the matter of the estate of the above-named bankrupts, disallowing the claim of appellant upon a note for $38,000 given to appellant by W. P. T. Varney (hereinafter called Tolby Varney), dated March 26, 1925, and indorsed by the two bankrupts April 6, 1925. The defenses made by the trustee, so far as important here, are (a) that the consideration for the bankrupt's indorsement was illegal, viz. the compounding of a felony alleged to have been committed by Tolby Varney in obtaining from claimant $26,000, part of the consideration of the $38,000 note here in question, by representing as genuine certain securities accompanying the $26,000 note, which securities were spurious to the extent of about 90 per cent. thereof; (b) undue influence and (c) duress practiced upon the indorser bankrupts; and (d) fraudulent representations by claimant to procure the bankrupt's indorsements. The referee's order disallowing and expunging the claim did not state the specific ground of the conclusion reached. The District Judge based his affirmance of the order on the ground that the consideration for the bankrupts' indorsement was the compounding of a felony, so finding it unnecessary to consider the other defenses.

[1] In our opinion the order of the District Court must be affirmed.[1] We content our-

---

[1] The burden is on the trustee in bankruptcy to establish the invalidity of the endorsement here in question. As it does not affirmatively appear that the referee based his conclusion on a finding of compounding a felony, but as the District Judge based his conclusion on that finding alone, the rule as to the credit to be given the concurrent findings of referee and judge

selves with setting out what appear to be the salient facts. The $38,000 note here in question was a renewal of the note for $26,000 above mentioned and another note for $12,000, both given claimant by Tolby Varney at separate dates in 1924, while the latter was an officer of a bank at Williamson, W. Va. The bank was closed by the state banking authorities on March 28, 1925, while Tolby Varney was in charge of its affairs. The bankrupts are mother and daughter. Both are widows. They lived together. They had no large means, except an estate for the mother's life, and after that for the life of the daughter, in a large tract of coal lands, which yielded an annual rental of about $12,000 by way of coal royalties. They were related—more or less remotely—to Tolby Varney, and apparently had had great confidence in him and in his ability. They had usually, perhaps always, indorsed his paper, for his accommodation, when requested. When the bank was closed, they were indorsers on such paper to an amount apparently $85,000 to $100,000 (possibly more), including a note for $15,000 likewise given by Varney to claimant. With the closing of the bank there were rumors of misconduct on Varney's part in connection with the bank's affairs, and some question had been raised, at least by rumor, whether the bankrupt's indorsement on the $15,000 note was genuine.

The record is convincing that the $26,000 loan was procured through Varney's representation to claimant that the collateral stock was genuine, and with knowledge that it was spurious to the extent already stated. Under the laws of West Virginia, the obtaining of money by false representations constituted a felony (Barnes' West Virginia Code 1923, c. 145, § 23), and the compounding of a criminal offense was made a crime (Id., c. 147, § 19).

On April 1, 1925, claimant learned, through the officers and state authorities in charge of the bank, of the spurious nature of the securities held for the $26,000 note. Three days later (on Saturday, April 4, 1925) claimant (who lived at Welch, W. Va.),

(Ohio Valley v. Mack [C. C. A. 6] 163 F. 155, 24 L. R. A. [N. S.] 184), is not applicable. Nor can we apply the rule of credit to be given the fact conclusion of the District Judge, who saw and heard the witnesses, for this case was heard below on the testimony taken before the referee. The case must accordingly be decided here upon the weight of the testimony and the credibility of the witnesses as presented by the printed record. But, so considered, we have no difficulty in reaching the conclusion that the judgment of the court below was right.

his father-in-law, Harris (who lived at Nolen, 8 miles from Williamson), and his brother-in-law, Stevenson (who lived at Huntington), were together at the office of Claimant's attorney in Williamson, where Harris and Stevenson were told that the stock held as security for the $26,000 note was at least of questionable genuineness and value. On the afternoon of that day (which was Saturday) Harris and Stevenson went to the home of the bankrupts, about a mile and one-half from Williamson, to learn, first, whether bankrupts' purported indorsement of the $15,000 note was genuine; and, second, whether they would indorse a prospective note of Tolby Varney to the claimant for $38,000, in renewal of the $26,000 note and the $12,000 note, both of which were then past due. Harris had had close relations, including business relations for several years, with Alexander Varney, who was the husband and father, respectively, of the two bankrupts, and who had died several years previously. Harris had also had pleasant relations with both these women, and had visited at their home during the then last few years. Stevenson appears not to have been acquainted with them. He and Harris arrived at the women's home on Saturday afternoon, somewhere from 3 to 5 o'clock. They stayed there all night and until about 10 a. m. on Sunday. The validity of the $15,000 indorsement was admitted by the bankrupts. The desired indorsement was not given, and, we are satisfied, was not promised. Harris says the ladies did not refuse to indorse the proposed note for $38,000, but indicated they were willing to do anything to help Varney out.

The daughter testified that neither she nor her mother on that occasion agreed to sign the note; on the contrary, that she (the daughter) had then no idea of indorsing it; that she thought it was not just and right for them to do so; that when they indorsed the earlier notes they had confidence in Tolby Varney, and did not think there would be any trouble, but that they had lost that confidence to some extent; that she may have talked with her mother about it, but that the latter did not realize or understand the situation, and said that night (apparently Saturday) not to talk to her anything about it. In the forenoon of the day next following this visit, viz. on Monday, April 6th, Harris and Stevenson again appeared at the bankrupts' home, this time accompanied, not only by the claimant, but by Tolby Varney, the latter coming at the express request of claim-

ant, who, in company with Harris and Stevenson, brought Varney from his home. On that morning, before the arrival of this party, an attachment had been levied upon the property of the bankrupts at the instance of certain of the bank's, or Tolby Varney's, creditors. It not unnaturally appears from the testimony of the daughter that both she and her mother were greatly disturbed and depressed by this attachment. As the result of this last visit the mother and daughter indorsed the $38,000 note, which was antedated to correspond with the maturity of the notes which it was to take up.

The record, considered in its entirety, is persuasive that this indorsement was procured largely through representations, made on the April 6th visit, that claimant would prosecute Tolby Varney criminally unless this indorsement was secured, but that, if it was secured he would not prosecute, and that the misrepresentation about the $26,000 note was the only thing that Varney could be prosecuted for. The daughter testified that claimant said that, if the indorsement was not given, he would prosecute Varney, and indicated that he would also bring suit on the $15,000 note indorsed by the bankrupts; also that, after a conference out of doors between claimant, Harris, and Varney, one of them stated, while all three and claimant were together in the house, that they had fixed up an agreement that claimant was not to prosecute Varney "when I indorsed the note"; also that claimant said that, if the bankrupts would indorse the note, he, being a creditor, could stay off the other creditors and force them to come in on an agreement to carry it over a period of years, to give the bankrupts a chance to pay out of their royalties, and not close in on their property "all at once." The witness also testified, in considerable detail, of her efforts to keep these visitors (including claimant) from her mother, who was very much disturbed; that the daughter's protestations that the mother was unable to see them were overruled.

The testimony of this witness sustains an inference that the four visitors were acting in complete accord. We find no reason to doubt the general correctness of the daughter's testimony. There was also testimony of the presentation of an argument by one of the party that, if claimant had bankrupts' indorsement for the entire $53,000, he would be in at least a much better position to control the action of Varney's creditors generally.

The testimony opposed to that of the daughter is unsatisfactory and unconvincing.

Claimant's denial of making the assurances and threats referred to, regarding prosecution or nonprosecution of Tolby Varney, is strongly discredited by the admission that on the morning of this Monday visit to the bankrupts' home, and before starting on the trip, claimant stated the case to a justice of the peace, and received the assurance that he would issue a warrant for Varney if claimant "brought it up," by which claimant understood the justice to mean that he (claimant) "could have him arrested and bring him to Welch, and he (the justice) would issue the warrant." Claimant also admitted that, apparently on substantially the same occasion, he inquired of a deputy sheriff whether he would be willing to arrest Varney, and that the deputy did not say positively that he would, and that claimant did not see the deputy again until the next day. No arrest was ever made, and claimant denies seeing either the justice or the deputy sheriff on any later occasion. The fact, testified by claimant, that he stated the case to the prosecuting attorney, does not, to our minds, overcome the effect of the other facts stated. As bearing upon the suggestion that claimant could influence the action of other creditors in the manner above referred to, it appears that within a few days after claimant received the desired indorsement he negotiated a sale of his entire $53,000 of paper (not then mature) at a discount of $3,000. The fact that the sale fell through at the instance of the expected purchaser does not alter the effect of that action.

The testimony of Harris impresses us as unsatisfactory and unconvincing. Although he testified that he did not "recollect" telling the women that, if claimant were secured, the latter would take no further proceeding in a criminal prosecution, and that he "didn't know" that he told them that claimant would be satisfied if those notes were signed by them, in answer to the question whether he did not tell them in words to the effect that claimant would be satisfied if those notes were signed by them, and whether he did not give them so to understand, he answered, "Well, in sum and substance, I expect I did." He says he knew it would embarrass the women's financial condition to indorse the $38,000 note. It would seem that it should have been equally apparent to each of the four men. Bankruptcy soon followed that action.

Stevenson did not testify. Tolby Varney, who, when he testified as a witness for claimant, was confined in the West Virginia penitentiary upon conviction in a state court

for a criminal offense not stated, denied that any promise not to prosecute him was made by claimant at the visit of April 6th, when the $38,000 note was indorsed. But his testimony is not convincing. It goes without saying that naturally he was intensely interested in the result sought, and which in fact was accomplished.

We agree with the District Judge that there is no other reasonable way to account for Varney's action in taking the part he did in procuring the indorsement than that it was to save himself from criminal prosecution at the hands of claimant. As the judge well said: Varney "not only took part when others were present, but he conferred alone with the daughter, and possibly with the mother." We also think the judge rightly concluded that Harris' testimony that on Monday, April 6th, when the indorsements were taken, the claimant said he was not interested in any criminal prosecution, that all he wanted was to get better security for his notes, could have no other meaning, under the circumstances, than a promise on the part of the claimant that, if he obtained the security in question, he would not prosecute Varney criminally; also that, if the claimant's statement that the remark just referred to was not made until after the note had been signed was true, it still appeared that the matter of prosecuting Varney "was all along in the background, if not in the foreground, and that the promise not to prosecute was the basic cause of the indorsements, the giving of which called for the assurance that the promise would be complied with and he would not be prosecuted."

It is true that the mother did not testify, but we see no reason to doubt the correctness of the daughter's statement that the mother (who was then 73 years old) was neither physically nor mentally capable of testifying; also to the effect generally that the mother was in no proper condition to exercise judgment upon the propriety of the proposed indorsements; that she was just getting over the "flu and grip," and was very weak; and that while in this condition and confined to her home she was importuned by one or the other of the visitors against the expressed opposition of the daughter.

The fact that the daughter was apparently an intelligent and competent woman, accustomed (largely at least) to look after her own and her mother's affairs, and that she for a time had taught school and operated a store, does not, to our minds, in view of all the facts and circumstances surrounding the transaction here in question, substantially affect the conclusion we have reached.

[2, 3] It results from these views that the bankrupts' indorsement of the $38,000 note is unenforceable. The intention of the parties to compound a crime rendered the contract unenforceable on the ground of public policy. In re Lawrence (C. C. A. 2) 166 F. 239. It is not necessary to such result that the compounding be the sole consideration for the promise. A contract is illegal, where an essential and indivisible part of the consideration is tainted with illegality. C., C., C. & St. L. R. R. Co. v. Hirsch (C. C. A. 6) 204 F. 849, 854; Western Indemnity Co. v. Crafts (C. C. A. 6) 240 F. 1, 7, 8. It is true that the mere hope that criminal prosecution may be prevented, and the fact that security is taken for the money embezzled or wrongfully obtained, that restitution is being made or secured by the offender, or that threats of prosecution precede the giving of the note or security, do not alone amount to illegal consideration, or necessarily avail the one relying on one or all of these facts to prevent recovery; but that is not the whole case here. Not only had the bankrupts no connection with Varney's fraudulent obtaining of money from claimant, and so were under no legal or moral obligation to provide payment therefor, but, as we have already stated, we are convinced that a substantial part of the consideration for the indorsement was an agreement not to prosecute Tolby Varney.

We think the decree of the District Court should be affirmed, upon the ground adopted by the judge. We are also impressed that the indorsements in question were brought about by undue influence, within the meaning of the law.